# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SANDRA JOAN WHITAKER,
      Plaintiff,

      v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,
      Defendant.

No. 3:17-cv-1337 (SRU)

## RULING ON CROSS-MOTIONS FOR JUDGMENT ON THE PLEADINGS

In the instant Social Security appeal, Sandra Joan Whitaker[1] ("Whitaker") moves to reverse the decision by the Social Security Administration ("SSA") denying her disability insurance benefits. Mot. to Reverse, Doc. No. 20. The Commissioner of Social Security moves to affirm the decision. Mot. to Affirm, Doc. No. 21. For the reasons set forth below, Whitaker's Motion to Reverse the Decision of the Commissioner (Doc. No. 20) is **DENIED** and the Commissioner's Motion to Affirm its Decision (Doc. No. 21) is **GRANTED**.

## I.      Standard of Review

The SSA follows a five-step process to evaluate disability claims. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). First, the Commissioner determines whether the claimant currently engages in "substantial gainful activity." *Greek v. Colvin*, 802 F.3d 370, 373 n.2 (2d Cir. 2015) (per curiam) (citing 20 C.F.R. § 404.1520(b)). Second, if the claimant is not working, the Commissioner determines whether the claimant has a "'severe' impairment," i.e., an impairment that limits his or her ability to do work-related activities (physical or mental). *Id.*

---

[1] The case was filed under the caption "Sandra Joan Whitaker v. Commissioner of Social Security" but the record here reflects that her name is actually Joan Sandra Whitaker.

(citing 20 C.F.R. §§ 404.1520(c), 404.1521). Third, if the claimant does not have a severe impairment, the Commissioner determines whether the impairment is considered "per se disabling" under SSA regulations. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). If the impairment is not per se disabling, then, before proceeding to step four, the Commissioner determines the claimant's "residual functional capacity" based on "all the relevant medical and other evidence of record." *Id.* (citing 20 C.F.R. §§ 404.1520(a)(4), (e), 404.1545(a)). "Residual functional capacity" is defined as "what the claimant can still do despite the limitations imposed by his [or her] impairment." *Id.* Fourth, the Commissioner decides whether the claimant's residual functional capacity allows him or her to return to "past relevant work." *Id.* (citing 20 C.F.R. §§ 404.1520(e), (f), 404.1560(b)). Fifth, if the claimant cannot perform past relevant work, the Commissioner determines, "based on the claimant's residual functional capacity," whether the claimant can do "other work existing in significant numbers in the national economy." *Id.* (citing 20 C.F.R. §§ 404.1520(g), 404.1560(b)). The process is "sequential," meaning that a petitioner will be judged disabled only if he or she satisfies all five criteria. *See id.*

The claimant bears the ultimate burden to prove that he or she was disabled "throughout the period for which benefits are sought," as well as the burden of proof in the first four steps of the inquiry. *Id.* at 374 (citing 20 C.F.R. § 404.1512(a)); *Selian*, 708 F.3d at 418. If the claimant passes the first four steps, however, there is a "limited burden shift" to the Commissioner at step five. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). At step five, the Commissioner need only show that "there is work in the national economy that the claimant can do; he [or she] need not provide additional evidence of the claimant's residual functional capacity." *Id.*

In reviewing a decision by the Commissioner, I conduct a "plenary review" of the administrative record but do not decide *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam); *see Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam) ("[T]he reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."). I may reverse the Commissioner's decision "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek*, 802 F.3d at 374-75. The "substantial evidence" standard is "very deferential," but it requires "more than a mere scintilla." *Brault*, 683 F.3d at 447-48. Rather, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Greek*, 802 F.3d at 375. Unless the Commissioner relied on an incorrect interpretation of the law, "[i]f there is substantial evidence to support the determination, it must be upheld." *Selian*, 708 F.3d at 417.

## II.    Facts

Whitaker filed for Social Security benefits on January 11, 2013, and filed an application for supplemental security income on May 7, 2013. Applications for Benefits, R. at 228, 232. In both applications, Whitaker alleged a period of disability from December 11, 2012. *Id*. Whitaker alleged in her application that she suffered from "diabetes, degenerative discs disease, diabetic retinopathy, neuropathy, depression and anxiety." Int'l Disability Determination Explanation, R. at 117. The SSA initially denied her disability benefits claim on May 2, 2013, finding that Whitaker's "medical evidence shows no significant mental problems" and that the SSA did "not have sufficient vocational information to determine whether [she could] perform any of [her] past relevant work." *Id*. The SSA considered Whitaker's "age, education, training,

and work experience" and determined that Whitaker was able to adjust to other work and that her "condition [was] not severe enough to keep [her] from working." *Id.* On May 7, 2013, Whitaker sought reconsideration of the agency's decision. Request for Reconsideration, R. at 121. The SSA again denied her claim on July 23, 2013 for the same reasons as stated in the initial denial. Notice of Reconsideration, R. at 124.

On August 28, 2013, Whitaker requested a hearing before an Administrative Law Judge ("ALJ"). Hr'g Request, R. at 138. The hearing was held on February 23, 2015 before ALJ John Benson. Tr. of ALJ Hr'g, R. at 35. At the hearing, Whitaker testified that her back issues, vision, diabetes, and neuropathy prevented her from working. *Id*. at 44. She testified that her diabetes was "not in very good control," she could not "lift or pull anything over five to ten pounds," and her neuropathy caused her hands to go numb when using "a mouse or something" or "just holding something." *Id*. at 44. Whitaker testified that she previously held a job as a manager at Lowe's, but that she was unable to drive at night because of her vision which caused her to get laid off. *Id*. at 42. She also testified that she could not do the "lifting and pulling" tasks that her job entailed, she could not do the "computer work" because of her vision, and she could not use the power equipment because she did not have peripheral vision in her left eye. *Id*. at 43, 47. With respect to her eyes, Whitaker testified that she could not "look at [a computer] monitor for more than a couple minutes" before her eyes would become painful and dry and that she could not usually see the television so she "pretty much listen[ed]." *Id*. She testified that she could not read the newspaper and could only read "[l]arge print." *Id*. at 44. Further, Whitaker testified that her diabetes caused her to miss work one to four times per month. *Id*. at 46.

After losing her job at Lowe's, Whitaker went to school to become a barber and graduated in 2014, and she passed a state test in November 2014. Tr. of ALJ Hr'g, R. at 44. She

testified that she attended barber school four days per week from 9:00 to 5:30 for twelve months. *Id*. at 55. She testified that in the morning portion of the class consisted of learning "theory" in the classroom and in the afternoon, she would be doing "hands-on" work in the barbershop. *Id*. at 55. Whitaker testified that she had not yet tried to find work in that field because she had surgery in January but that she "would like to" try to find a job as a barber. *Id*. at 45.

With respect to her lifestyle, Whitaker testified that she drove to stores and doctor appointments about four days per week and sometimes her friends picked her up to go out to dinner. Tr. of ALJ Hr'g, R. at 42-44. She testified that she had to take breaks while doing household chores because it made her back hurt and her hands go numb. *Id*. at 48. She testified that she could not cook because she could not stand to do so and could not do the repetitive cutting and chopping motions, and that she could not do her own laundry because she could not carry it. *Id*. She testified that she would get "penetrating pain from [her] left lower back down [her] leg" if she tried to lift something too heavy. *Id*. at 49. She testified that because of lower back pain and numbness in her feet, she could only walk for five to ten minutes. *Id*. at 50. Whitaker testified further that she had shoulder issues as well due to "physically demanding jobs" and that when she does any "repetitive motion" her shoulders get "stiff [and are] unable to move." *Id*. at 51. She testified that she could not "fully extend [her] arms overhead" but could "extend [her] arm level with [her] shoulder." *Id*. She testified that her vision issues caused headaches three to four times per week that last for a few hours at a time, caused by "staring at a monitor too long" or by "trying to read something or look at something for any period of time." *Id*. at 51-52. Whitaker also testified that she was undergoing treatment for depression and attention deficit hyperactivity disorder. *Id*. at 53.

The ALJ then heard testimony from the Vocational Expert, James Parker ("Parker"), who testified that Whitaker's former job as Lowe's manager was a medium exertion, skilled job. Tr. of ALJ Hr'g, R. at 58. The ALJ asked Parker to assume a person of Whitaker's age, education, and work experience who could perform work at the light exertion level with the following limitations: could only walk or stand for four hours in an eight-hour work day; required an option to alternate between sitting and standing at 60-minute intervals; could never climb ladders, ropes, or scaffolding; could occasionally climb ramps or stairs; could occasionally balance, stoop, crouch, kneel, and crawl; must avoid concentrated exposure to extreme cold and excessive vibration, i.e. power tools; must avoid all exposure to unprotected heights or "dangerous moving machinery;" could not work with computer screens more than five minutes at a time and for a total of one hour per workday; could not drive at night; could only read large print; and could not do any work requiring peripheral vision in the left eye. *Id.* at 58-59. Parker testified that with those limitations, Whitaker's "past work could not be performed" because the exertion level was medium, rather than light. *Id.* at 59. Parker opined that there were three jobs, however, that someone with those limitations could do: (1) a recreation attendant, which requires "checking people into and out of facilities like health clubs, and scan[ning] their barcodes," with 300 regional jobs and 30,000 national jobs; (2) sorting and folding laundry, with 400 regional jobs and 90,000 national jobs; and (3) a flower care worker, with 175 regional jobs and 40,000 national jobs. *Id.* at 59-60. Parker testified that those three jobs could also be performed with the additional limitation of frequent handling[2] and frequent fine manipulation. *Id.* at 66. With an additional limitation of frequently lifting ten pounds, Parker testified that the recreation attendant

---

[2] The ALJ clarified that he defined "handling" as "grasping and twisting, such as turning a door handle, manipulating things with your hands, not simply closing your hand around something and lifting it up." Tr. of ALJ Hr'g, R. at 66.

and flower care worker could still be performed, but not the laundry sorter. *Id*. With handling and fingering changed to "occasional," Parker testified that only the recreational attendant position would be available from the first list, but also a sales attendant which is "essentially a greeter," with 300 regional jobs and 60,000 national jobs. *Id*. at 67-68.

The ALJ then asked Parker to assume all of the limitations from the original hypothetical with the following additional limitations: could frequently lift or carry up to 10 pounds; could only occasionally reach overhead; and could only occasionally read large print. Tr. of ALJ Hr'g, R. at 60. Parker testified that with those additional limitations, the work would be "sedentary" which would require fine motor skills and with the peripheral vision limitation in the left eye, the following jobs would be available: (1) preparer polisher which entails "preparing gold, silver jewelry for display purposes," with 250 regional jobs and 33,000 national jobs; (2) inspection tablework which consists of "inspecting … tiles for defects" at a retail or distribution facility, with 280 regional jobs and 29,000 national jobs; and (3) information clerk, a semi-skilled position, with 350 regional jobs and 100,000 national jobs. *Id*. at 60-62. Parker also testified that missing more than one day per month "on a sustained basis" would lead to termination. *Id*. at 69.

On April 30, 2015, the ALJ issued an opinion in which he found that Whitaker was "not under a disability within the meaning of the Social Security Act from December 11, 2012, through the date of th[e] decision." ALJ Decision, R. at 19. At the first step, the ALJ found that Whitaker "ha[d] not engaged in substantial gainful activity since December 11, 2012, the alleged onset date." *Id*. at 20. At the second step, the ALJ determined that Whitaker's impairments of "degenerative disc disease and diabetes mellitus with diabetic retinopathy" were "severe impairments" that "cause[d] more than a minimal limitation in [Whitaker's] ability to perform

basic physical and mental work activities." *Id*. at 21. The ALJ found that Whitaker's claimed depression was a "non-severe impairment, as it would no more than minimally limit[ Whitaker's] ability to engage in regular work activities." *Id*.

At the third step, the ALJ determined that Whitaker "d[id] not have an impairment or combination of impairments that me[t] or medically equal[ed] the severity of one of the listed impairments[.]" ALJ Decision, R. at 22. Specifically, the ALJ stated that he considered the criteria for "disorders of the endocrine system" in relation to Whitaker's diabetes and "disorders of the spine" in relation to Whitaker's back pain but that "the medical evidence of record [did] not contain the objective signs, symptoms, or findings, or the degree of functional restriction necessary for [Whitaker's] impairments to meet or equal in severity" the listings. *Id*., at 23.

The ALJ then assessed Whitaker's Residual Functional Capacity ("RFC") and found that she could perform light work with the following limitations: (1) could occasionally climb ramps and stairs; (2) could only stand or walk for four hours during an 8-hour workday; (3) could occasionally balance, stoop, kneel, crouch, and crawl; (4) must avoid concentrated exposure to extreme cold and all exposure to vibration, dangerous moving machinery and unprotected heights; (5) could not perform jobs involving night driving; (6) could only use a computer screen for 5 minutes at a time for a total of one hour per eight hour a day; (7) could only read large print; and (8) could not perform work requiring peripheral vision in the left eye. ALJ Decision, R. at 23. The ALJ stated that he "considered all symptoms and the extent to which th[ose] symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence" as well as "opinion evidence" in making his determination. *Id*. The ALJ concluded that Whitaker's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," back pain and symptoms "associated with diabetic retinopathy and

neuropathy," but went on to conclude, however, that Whitaker's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible[.]" *Id.* at 25. The ALJ discredited Whitaker's testimony regarding the severity of her limitations because "[t]he documentary medical evidence of record does not support the level of limitation alleged by" Whitaker. *Id.* With respect to Whitaker's back impairment, the ALJ opined that "the treatment records do not document the type of treatment one would expect given the allegations of total disability." *Id.* Further, the ALJ noted that "treatment records contain[ed] little reference to treatment related to complaints of back pain" even though Whitaker had been complaining of back pain since "at least 2011" and that "the treatment records document[ed] only modest findings and clinical observations." *Id.* (referencing Ex. 1F, 6F, 13F, 15F) The ALJ opined that, overall, Whitaker's "sporadic treatment accompanied by mild findings [did] not support the level of limitation opined." *Id.*

With respect to Whitaker's diabetes symptoms, the ALJ opined that "the treatment records related to [Whitaker's] diabetic condition [did] not show the type of treatment or findings one would expect given the reports of disabling symptoms." ALJ Decision, R. at 25. The ALJ noted that "the treatment records generally indicate that [Whitaker's diabetic] condition require[d] no more than monitoring." *Id.* The ALJ discredited Whitaker's testimony regarding her claimed neuropathy because "treatment records document very few reports of hand symptoms" and "recent treatment records show that [Whitaker was] able to make a complete fist with both hands and [was] further able to demonstrate full grip strength bilaterally." *Id.* (referencing Ex. 13F). The ALJ opined that his determination about Whitaker's limitations resulting from her retinopathy and neuropathy was consistent with the clinical findings in the record. *Id.* Further, the ALJ discredited Whitaker's testimony because "the evidence of record

shows that [Whitaker] ha[d] a history of poor compliance with treatment recommendations" including failing to check her blood sugar as often as recommended, "if at all," and failing to follow a diabetic diet. *Id*. (referencing Ex. 4F, 6F, and 10F). The ALJ highlighted that the record reflected that Whitaker admitted "she could put more effort into controlling her condition" and that when she was compliant with treatment, "her symptoms have improved." *Id*. (referencing Ex. 10F).

The ALJ also discredited Whitaker's testimony because her "demonstrated abilities [were] … highly inconsistent with her allegations" and highlighted as support Whitaker's completion of barber school, which was "wholly inconsistent with her allegations of significant difficulties standing, using her hands, and paying attention." ALJ Decision, R. at 26. The ALJ further opined that her successful completion of barber school suggests that Whitaker "is capable of standing the time required to cut and/or style someone's hair, exhibiting the type of manual dexterity that is inherent in [that] work and maintaining the type of focus and attention required to perform the required tasks at an acceptable level" and that the work required "significant visual acuity." *Id*.

Further, the ALJ "relied upon the information provided within the treatment records including the clinical findings, subjective complaints, and diagnostic testing" in determining Whitaker's ability to perform work activity because "[n]o treating source provided an assessment" as such. ALJ Decision, R. at 26. The ALJ also considered the narrative statement from Whitaker's primary care physician, Dr. Pang Wang, and gave "great weight" to the portion referencing Whitaker's inability to drive at night, but gave "little weight" to the remainder of the statement because it was "vague and conclusory." *Id*. (referencing Ex 8F). The ALJ also gave "great weight" to the opinions of the state agency consulting physicians' opinions because they

"reflect adequate consideration of the evidence of record as a whole, and are well supported by citation to the record … which support the consultant's conclusions." *Id*. (referencing Ex. 2A, 3A, 4A). The ALJ opined that Whitaker's RFC, as determined in the opinion, was "supported by the evidence contained in the record as a whole. [Whitaker's] allegations and testimony were taken into consideration and portions thereof support the assigned [RFC]." *Id*. at 27.

At the fourth step, the ALJ determined that Whitaker was "unable to perform any past relevant work." ALJ Decision, R. at 27. At the fifth step, the ALJ concluded that, based upon Whitaker's "age, education, work experience, and residual functional capacity," there were "jobs that exist[ed] in significant numbers in the national economy that [Whitaker could] perform." *Id*. The ALJ further stated that "[b]ased on the testimony of the vocational expert … [Whitaker was] capable of making a successful adjustment to other work that exist[ed] in significant numbers in the national and local economy." *Id*. at 28. The ALJ determined that a "finding of 'not disabled' [was] therefore appropriate," and denied Whitaker's request for disability benefits. *Id*.

On May 16, 2015, Whitaker filed a request for review of the ALJ's decision by the SSA's Appeals Council alleging, inter alia, that the ALJ "didn't look at any info[r]mation from [her] current psychiatrist," that she "cannot perform any of the positions [she] was able to [do] before," and that "there is no way that [she] can have gainful employment with everything together." Request for Review of Hearing Decision/Order, R. at 12-14. Holding that there was "no reason … to review the ALJ's decision," the Appeals Council denied Whitaker's request for review on October 11, 2016. Notice of Appeals Council Action, R. at 8. Whitaker then filed a complaint before this court on August 8, 2017 urging reversal of the Commissioner's Decision. Compl., Doc. No. 1. Whitaker filed a Motion to Reverse the Decision of the Commissioner on

January 11, 2018.  Mot. To Reverse, Doc. No. 20.  The Commissioner filed a Motion to Affirm

its decision on January 24, 2018.  Mot. To Affirm, Doc. No. 21.

## III.    Discussion

On review, Whitaker asserts that the ALJ's decision "rested on incomplete consideration

of the medical record and … on the unwarranted rejection of [Whitaker's] credibility."  Mem.

Supp. Mot. to Reverse, Doc. No. 20-2 at 4.  Specifically, Whitaker contends that the ALJ: (1)

erred in citing the medical records regarding her visual impairment, *id*. at 4; (2) failed to

adequately develop the record, *id*. at 8; (3) improperly discredited Whitaker's testimony, *id*. at

11; and (4) made a deficient RFC determination, *id*. at 30.  The Commissioner responds that the

ALJ's decision was supported by substantial evidence.  *See* Mem. Supp. Mot. Affirm, Doc. No.

21.

### A.  Did the ALJ err in assessing Whitaker's visual impairment?

Whitaker alleges that the ALJ erred in assessing her visual impairment because he only

discussed her loss of peripheral vision in her left eye and "excluded mention of any other aspect

of her visual impairment."  Mem. Supp. Mot. Reverse, Doc. No. 20-2 at 4.  She alleges that she

has the following additional conditions that the ALJ failed to consider: her left eye is more

severely impaired than just a loss of peripheral vision; her right eye is also impaired; and she has

dry eye syndrome.  *Id*. at 4-8.  The Commissioner argues that substantial evidence supported the

ALJ's inclusion of Whitaker's "self-described residual work-related visual-impairments" in the

RFC determination.  Mem. Supp. Mot. Affirm, Doc. No. 21 at 2.

Whitaker is mistaken in her argument that the ALJ only considered the loss of peripheral

vision in her left eye in determining whether she was entitled to disability on the basis of her eye

condition(s).  In his RFC finding, the ALJ incorporated a number of Whitaker's claimed vision

limitations including that she could not drive at night, that she could only use a computer screen for five minutes at a time, that she could only read large font, *and* that she did not have peripheral vision in her left eye. ALJ Decision, R. at 23. The limitations enumerated in the ALJ's RFC finding perfectly correlate to Whitaker's own testimony about her visual limitations. She testified that she could not drive a night, nor could she "look at [a computer] monitor for more than a couple minutes" before her eyes would become painful and dry. Tr. of ALJ Hr'g, R. at 42-43. Further, she testified that she could only read "[l]arge print" and that her vision issues caused headaches three to four times per week that lasted for a few hours at a time, caused by "staring at a monitor too long" or by "trying to read something or look at something for any period of time." *Id*. at 44, 51-52. The ALJ very clearly took all of Whitaker's claimed conditions into consideration when determining her RFC.

Further, the limitations in the RFC are supported by substantial medical evidence in the record, in addition to Whitaker's testimony. Dr. Underhill wrote in her treatment notes that Whitaker "reported blurred vision in her left eye, and said she had no vision in this eye … [and was] unable to drive at night." Underhill Treatment Notes, Ex. 7F, R. at 500. Dr. Wang's treatment notes also reflect that Whitaker's retinopathy "prohibits [Whitaker] from driving at night." Wang Treatment Notes, Ex. 8F, R. at 511. Treatment notes from Valley Medical Center from 2013-2014 reflect that Whitaker underwent eye procedures and had "loss of vision field in left eye" but tested negatively for bilateral blurred vision. VMC Treatment Notes, Ex. 10F, R. at 526-41. Additionally, the notes reflect that her eye "lids and conjunctiva" were "normal." *Id*.

Lastly, Whitaker claims that the ALJ failed to consider her dry eye symptoms in making his determination. As noted above, however, Whitaker testified that her eyes became dry when she stared at a computer monitor too long, which the ALJ very clearly took into consideration

when limiting Whitaker's RFC to looking at a computer screen for only five minutes at a time. To the extent that Whitaker claims she has additional dry eye issues, any such claim is not supported by the record. Treatment notes from Pain Care Center of Wallingford from 2014-2015 reflect that at every appointment, Whitaker denied having eye "discharge" or "[d]ry eye." PCCW Treatment Notes, Ex. 13F, 605-29; Ex. 15F, 632-58.

The ALJ is required to determine, for purposes of an RFC finding, what functions "the claimant can still do despite the limitations imposed by his [or her] impairment." *Greek*, 802 F.3d at 373 n.2. Here, the ALJ's RFC finding incorporated all of Whitaker's claimed limitations, as detailed in her testimony. Accordingly, the ALJ's RFC determination with respect to Whitaker's visual limitations was supported by substantial evidence.

### B. Was the ALJ's RFC determination deficient?

Similar to her first argument, Whitaker argues that the ALJ's RFC determination was deficient. Mem. Supp. Mot. Reverse, Doc. No. 20-2 at 30. Specifically, Whitaker argues that the ALJ failed to include in his RFC determination "limitations related to chronic headaches, essentially no vision in her left eye, dry eye syndrome, fluctuating vision in both eyes with general difficulty seeing and frequent burning in her hands and feet, and limited use of her hands and feet to sustain standing or walking." *Id*. at 32. The Commissioner argues that the ALJ did in fact include all of the claimed limitations in his RFC determination. Mem. Supp. Mot. Affirm, Doc. No. 21 at 11-12.

The ALJ makes clear in his decision that he did, in fact, include in his RFC determination all of Whitaker's subjective complaints regarding her eyes. First, Whitaker claims that he failed to include "limitations related to chronic headaches." Her testimony made clear, however, that her chronic headaches resulted from "staring at a monitor too long" or by "trying to read

14

something or look at something for any period of time." Tr. of ALJ Hr'g, R. at 44. In his RFC determination, the ALJ found that Whitaker was limited to using a computer monitor for only five minutes at a time, and limited to reading large font only. ALJ Decision, R. at 23. Second, Whitaker claims that the ALJ failed to include her "dry eye syndrome." As noted in the previous section, however, Whitaker alleged that her dry eyes were caused by looking at a computer screen for "more than a couple minutes." Tr. of ALJ Hr'g, R. at 42-43. Again, the ALJ's limitation on computer screen time in his RFC determination addressed her dry eye concerns. Further, Whitaker claims that the ALJ failed to consider her vision impairment in each eye, more considerably her left eye. However, in addition to her headaches and dry eyes, Whitaker testified that her only other restrictions stemming from her eye impairments were that she had no peripheral vision in her left eye, could not drive at night, and could not read small print. She did not claim any additional limitations. Accordingly, the ALJ's RFC determination limiting Whitaker to jobs that do not require left eye peripheral vision or nighttime driving, and limiting her to reading large print, adequately address all of her claimed eye limitations.

Whitaker also claims that the ALJ failed to take into consideration in his RFC determination her limitations with her hands due to her neuropathy. The ALJ, however, considered Whitaker's claimed hand conditions and expressly discredited her complaints. ALJ Decision, R. at 25. In his decision, the ALJ found that "treatment records document very few reports of hand symptoms" and that "treatment records show that [Whitaker] is able to make a complete fist with both hands and is further able to demonstrate full grip strength bilaterally." *Id*. Accordingly, the ALJ determined that the record did not support an RFC that limited Whitaker's use of her hands. That determination is supported by the medical record here, which contains very few mentions of complaints made by Whitaker about her hands. Indeed, treatment

records show that on many occasions she was "able to make a full fist" with both hands, both hands had "full grip with 5/5 strength," and both wrists have "full range of motion." PCCW Treatment Notes, Ex. 13F, R. at 605-06, 609-10, 613, 617, 621, 625. Accordingly, the record does not support a determination that Whitaker had limitations in her hands and, therefore, the ALJ did not err by not including hand limitations in his RFC determination.

Whitaker also claims that the ALJ failed to take into consideration in his RFC determination her limitations with her feet due to frequent burning and numbness caused by her neuropathy. As discussed more fully in Section III(D) of this opinion, the ALJ's RFC determination with respect to Whitaker's foot concerns was supported by substantial evidence. Although the ALJ should have addressed more fully Whitaker's claims of foot neuropathy, his RFC determination took her limitations into consideration and was supported by the record and, therefore, was not deficient.

C. Did the ALJ fail to develop the record?

Whitaker argues next that the ALJ failed to develop the administrative record. Mem. Supp. Mot. Reverse, Doc. No. 20-2 at 8. Specifically, Whitaker argues that the ALJ misinterpreted the medical evidence with respect to her eye limitations and, therefore, the duty to develop the record was triggered. *Id*. The Commissioner argues that the ALJ correctly "solicited medical evidence from … Whitaker's medical providers" and the ALJ adequately developed the record. Mem. Supp. Mot. Affirm, Doc. No. 21 at 4-6.

"[T]he ALJ, unlike a judge in a trial, must … affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (citation omitted) (internal quotation marks omitted). It is not "per se error for an ALJ to make a disability determination

without having sought the opinion of the claimant's treating physician." *Sanchez v. Colvin*, 2015 WL 736102, at *5 (S.D.N.Y. 2015). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information." *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

The failure of the ALJ to procure formal opinions about a claimant's residual functional capacity does not, by itself, require remand where the medical record is "quite extensive[,] … voluminous[,] … [and] adequate to permit an informed finding by the ALJ." *Tankisi*, 521 F. App'x at 34. "Remand is not always required when an ALJ fails in his duty to request opinions particularly where … the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity." *Id.* That is particularly true where the record includes assessments of the claimant's limitations from a treating physician. *Id.* Remand is required where an ALJ's residual functional capacity decision is "wholly unsupported by any medical evidence." *Jermyn v. Colvin*, 2015 WL 1298997, at *19 (E.D.N.Y Mar. 23, 2015). Additionally, a claimant "must show that [she] was harmed by the alleged inadequacy of the record." *Santiago v. Astrue*, 2011 WL 4460206, at *2 (D. Conn. Sept. 27, 2011).

Here, the ALJ stated that "no treating source ha[d] provided an assessment of [Whitaker's] ability to perform work activity." ALJ Decision, R. at 26. Accordingly, the ALJ stated that, in determining Whitaker's RFC, he "relied upon the information provided within the treatment records including the clinical findings, subjective complaints, and diagnostic testing contained therein." *Id.* Further, the considered the "narrative statement" provided by Whitaker's primary care physician, Dr. Wang, as well as the "opinions provided by the State Agency consultants." *Id.* With respect to the latter, the ALJ found that those opinions "reflect adequate

consideration of the evidence of record as a whole, and are well supported by citation[s] to the record." *Id.*

Whitaker argues that the ALJ was under a duty to develop the record because he did not fully understand her visual limitations. Mem. Supp. Mot. Reverse, Doc. No. 20-2 at 10. As previously mentioned, the ALJ found that Whitaker had multiple eye limitations: she could not drive at night; could only use a computer screen for five minutes at a time; could only read large font; and had no peripheral vision in her left eye. All of those limitations were supported by the record. *See* Section III(A). Further, Whitaker herself testified that those were her only eye limitations. Tr. of ALJ Hr'g, R. at 42-44, 51-52. Accordingly, there were no obvious gaps in the record, and therefore, the ALJ was under no obligation to seek additional information with respect to Whitaker's eye limitations. *See Pellam*, 508 F. App'x at 90; *Tankisi*, 521 F. App'x at 34; *Jermyn*, 2015 WL 1298997, at *19.

D. Did the ALJ improperly discount Whitaker's credibility?

Whitaker claims that the ALJ made "multiple credibility findings not sup[por]ted by substantial evidence." Mem. Supp. Mot. Reverse, Doc. No. 20-2 at 11. Specifically, she argues that the ALJ erred in the following ways with respect to his credibility determination: finding that Whitaker was not compliant with her diabetic regimen and that her diabetes was uncontrolled, *id*. at 13, 18; relying on a statement that Whitaker was "doing well", *id*. at 19; relying on the fact that there were "few reports" of hand symptoms, *id*. at 20; relying on a statement that Whitaker's visual conditions required "no more than monitoring," *id*. at 21; relying on a finding that Whitaker had "normal gait" and "normal hand/leg strength," *id*. at 22; and highlighting the fact that Whitaker completed barber school, *id.* at 27. The Commissioner

argues that the ALJ adequately evaluated Whitaker's complaints. Mem. Supp. Mot. Affirm, Doc. No. 21 at 7.

I note first that it is the ALJ's role, and not mine, "'to resolve evidentiary conflicts and to appraise the credibility of witnesses,' including with respect to the severity of a claimant's symptoms." *Cichocki*, 534 F. App'x at 75 (quoting *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). An ALJ must employ a two-step process for evaluating symptoms. "First, the ALJ must determine whether the medical signs or laboratory findings show that a claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's" symptoms. *Cichocki*, 534 F. App'x at 75. An ALJ must consider all of the claimant's "symptoms, including pain, and the extent to which [her] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 416.929(a). The ALJ "will consider all of [a claimant's] statements about [her] symptoms, such as pain, and any description [her] medical sources or nonmedical sources may provide about how the symptoms affect [her] activities of daily living and [her] ability to work." *Id.* An ALJ must have "objective medical evidence from an acceptable medical source" that shows that a claimant has a medical impairment or impairments that "could reasonably be expected to produce the pain or other symptoms alleged." *Id.*

If the ALJ finds that the first step is met, then he must "'evaluate the intensity and persistence of [the claimant's] symptoms' to determine the extent to which the symptoms limit the claimant's capacity for work." *Cichocki*, 534 F. App'x at 75 (citing 20 C.F.R. § 416.929(c)(2)). In doing so, the ALJ considers "all of the available evidence" from medical and nonmedical sources, including objective medical evidence but will not reject a claimant's subjective assessment of the intensity and persistence of her pain "solely because the available

objective medical evidence does not substantiate [her] statements." 20 C.F.R. §§ 416.929(c)(1),

(2). "However, if a claimant's statements about [her] symptoms are not substantiated by the objective medical evidence, the ALJ must consider the other evidence and make a finding on the credibility of the individual's statements." *Cichocki*, 534 F. App'x at 76 (citing *Social Security Ruling 96-7p*, 1996 WL 374186, at *4 (July 2, 1996)). In doing so, the ALJ should consider the following factors: daily activities; "[t]he location, duration, frequency, and intensity" of the pain; "[p]recipitating and aggravating factors;" "[t]he type, dosage, effectiveness, and side effects of any medication" taken to alleviate pain; "[t]reatment, other than medication" received for pain relief; measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain[.]" 20 C.F.R. § 416.929(c)(3). Further, an ALJ will consider a claimant's subjective claims "in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether [she is] disabled" and will consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts" between the claimant's subjective claims and the "rest of the evidence" including the claimant's history, laboratory findings, and medical source statements regarding pain. 20 C.F.R. § 416.929(c)(4). If an ALJ determines that a claimant does have severe impairments, but the impairments do not meet or equal a listed impairment, then the ALJ "will consider the impact" of the claimant's impairment or impairments and related pain on the claimant's residual functional capacity. 20 C.F.R. § 416.929(d)(4).

"The ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.'" *Cichocki*, 534 F. App'x at 76 (citing *Social*

*Security Ruling 96-7p*, 1996 WL 374186, at *2)).  In making such a determination, the ALJ must

provide more than just "a single, conclusory statement" regarding the claimant's credibility or a

recitation of the relevant factors, but "remand is not required where 'the evidence of record

permits [the court] to glean the rationale of an ALJ's decision[.]'"  *Id.* (citing *Mongeur*, 722 F.2d

at 1040).

Here, at the first step, the ALJ found "[a]fter careful consideration of the evidence," that

Whitaker's "medically determinable impairments could reasonably be expected to cause the

alleged symptoms."  ALJ Decision, R. at 25.  At the second step, though, he found that

Whitaker's "statements concerning the intensity, persistence and limiting effects of [those]

symptoms [were] not entirely credible."  *Id.*

With respect to her diabetes, the ALJ found that Whitaker had a "history of poor

compliance with treatment recommendations," that treatment records showed that she was in

"poor control" of her diabetes, and that Whitaker "could put more effort into controlling her

condition."  *Id.*  As support for this contention, the ALJ cited to records from Griffin Hospital

from October 2012 that state that Whitaker was "very non-complaint with [follow-up] and

monitoring of her glucose levels" and that she "checks her sugar level very infrequently."

Griffin Records, Ex. 4F, R. at 375, 378, 389, 402.  Further, records reflect that in October 2012

Whitaker was "unsure" of her blood sugar levels "because she [didn't] check" it.  *Id.* at 382.  The

ALJ also cited to treatment notes that reflect that in August 2013 Whitaker reported she was not

checking her blood sugar because she ran out of test strips.  Valley Medical Records, Ex. 10F, R.

at 538.  Records reflect further that in May 2014, her diabetes "ha[d] not been very well

controlled."  Dr. Hamdheydarl Treatment Notes, Ex. 9F, R. at 524.  Further, in January 2015,

treatment notes reflect that Whitaker's diabetes was "uncontrolled."  OptiCare Treatment Notes,

R. at 660.  Although there are records that suggest that Whitaker was taking care of her diabetes at some points; *see* Ex. 10F, R. at 526, 530 (reporting blood sugar numbers), R. at 534 (checked blood sugar three times per day for a month), R. at 536 ("diabetes has been better controlled"); the treatment record supports the ALJ's determination that, on the whole, Whitaker was in poor control of her diabetes and, accordingly, her subjective complaints were not credible.  It is not my role "to resolve evidentiary conflicts" in the record.  *Cichocki*, 534 F. App'x at 75.  That is a determination best left to the ALJ.

With respect to Whitaker's back issues, the ALJ found that she had complained of back pain since 2011 but "treatment records contain little reference to treatment related to complaints of back pain."  ALJ Decision, R. at 25 (citing Ex. 6F, 13F, 15F).  As support, the ALJ highlighted multiple occasions in the medical record where doctors noted that Whitaker's subjective complaints of pain were inconsistent with her "appearance during the treatment visit." *Id*.  Further, the ALJ found that "physical examination findings consistently state[d] that [Whitaker was] able to demonstrate a full range of motion in the lumb[ar] spine, with only one noted incident of a slightly decreased range of motion."  *Id*. (citing Ex. 13F).  The ALJ found that "[o]verall, [Whitaker's] sporadic treatment accompanied by mild findings [do] not support the level of limitation opined."  *Id*.  The medical record here supports the ALJ's determination regarding Whitaker's credibility about her back pain.

Whitaker complained of lower back pain that "radiate[d] to both legs" beginning in March 2011.  Dr. Siegel Treatment Notes, Ex. 1F, R. at 341.  In May 2011, treatment notes reflect that Whitaker suffered from "[d]ecreased L5-S1 disc space" but otherwise had "normal lumbar vertebral height and alignment" and "unremarkable disc spaces."  Diagnostic Imaging Treatment Notes, Ex. 6F, R. at 496.  Her back pain is not discussed in the medical record again

until January 2013 when Dr. Carruth noted that Whitaker had "[c]hronic lumbar" pain and had a "mildly antalgic" gait. Dr. Carruth Treatment Notes, Ex. 6F, R. at 497. In February and March 2013, however, treatment notes reflect that Whitaker had "normal gait." Ex. 6F, R. at 498-99. In April 2013, Dr. Underhill noted that Whitaker reported having "pain on the lower left side [of her back] radiating down her leg" but noted that there was "no evidence of disturbance in [her] gait." Dr. Underhill Treatment Notes, Ex. 7F, R. at 500. In August 2013, Whitaker reported that she was having no back pain. Valley Medical Center Treatment Notes, Ex. 10F, R. at 538.

The record also reflects inconsistencies with Whitaker's claims of back pain. On March 6, 2014, she reported mid-back pain of eight and lower back pain of ten on a pain scale from one to ten; Dr. Wang Treatment Notes, Ex. 11F, R. at 584; but just four days later she reported having no back pain. Valley Medical Center Treatment Notes, Ex. 10F, R. at 530. Further, as the ALJ noted, treatment records reflect that although Whitaker was subjectively complaining of severe back pain, treatment providers noted that her appearance was inconsistent with her complaints. Treatment notes from January 2014 reflect that Whitaker "ambulate[d] without difficulty" except when squatting, and that she had "no limitation of motion of her lumbar spine with flexion or extension." Dr. Wang Treatment Notes, Ex. 11F, R. at 590-91. In February 2014, Whitaker complained of "stiff, throbbing, frequent" mid-back pain and "throbbing, stiff, numb, and constant" lower back pain, yet treatment notes from that visit reflect that she was "doing quite well and functioning reasonably well," "her pain [was] manageable," "she only ha[d] some pain in her low[er] back," she was "ambulating without difficulty," and that she had "some pain with extension and some limitation of motion." *Id.* at 588. In fact, at that visit, Dr. Wang noted "[a]t the next visit, if she continues to do well, I will continue to try to cut back her medication as long as she is doing well functionally." *Id.* at 589. In early March 2014, however,

Dr. Wang did note that Whitaker was "not functioning very well" and had "pain with flexion and extension of the lumbar spine" but was still "ambulating without difficulty." *Id*. at 586.

In May 2014, Whitaker complained of back pain at a nine or ten on a pain scale from one to ten, but the records reflect that "despite her very high pain rankings, [Whitaker] looks to be doing well," had "no acute distress," was "functional," and was "ambulating without difficulty." Dr. Marks Treatment Notes, Ex. 13F, R. at 628. In June 2014, Whitaker reported having no back pain. Valley Medical Center Treatment Notes, Ex. 10F, R. at 526. Treatment records from July, August, September, and October 2014, reflect that, despite high pain rakings, Whitaker was in "no acute distress," had "no obvious restrictions of motion," and had a "normal gait." PCCW Treatment Notes, Ex. 13F, R. at 612-14, 616-18, 620-22, 624-26. Similarly, treatment notes from November 2014 reflect that despite complaints of "burning, stiff, and constant" back pain, Whitaker was in "no acute distress" and reported that medication was helpful and that she had "improved functioning." *Id*. at 609-11. Additionally, in December 2014, Whitaker reported high pain rankings in her back and, although treatment notes reflect that she had "difficulty getting up from [her] chair," she reported that she was "functioning well" with "no problems." *Id*. at 605-07. Whitaker also reported improved functioning in January 2015. *Id*. at 633-34. Accordingly, the medical record supports the ALJ's finding that Whitaker's subjective complaints about her back pain were not credible.

The ALJ also discredited Whitaker's subjective complaints with respect to her diabetes, neuropathy, and back pain because he found that her "demonstrated abilities" were "highly inconsistent with her allegations." ALJ Decision, R. at 26. The ALJ relied heavily on Whitaker's completion of barber school as evidence that her subjective complaints were not credible. *Id.* He found that Whitaker's "ability to complete barber school is wholly inconsistent

with her allegations of significant difficulties standing, using her hands, and paying attention." *Id.* Overall, the ALJ found that her ability to successfully complete barber school "shows that [Whitaker's] functional abilities are greater than alleged" and support a finding that she "is capable of work activity within the functional limits established in the" RFC. *Id.* It was well within the ALJ's discretion to compare Whitaker's testimony regarding her daily activities and determine whether, in light of those activities, her subjective complaints were credible. 20 C.F.R. § 416.929(c)(3).

With respect to Whitaker's neuropathy, the ALJ focused more heavily on her hand limitations than on her foot limitations. In opining about Whitaker's neuropathy, the ALJ discredited Whitaker's subjective complaints on the basis of treatment records that showed "very few reports of hand symptoms." *Id.* The ALJ also highlighted that records reflect that Whitaker was "able to make a complete fist with both hands and [was] further able to demonstrate full grip strength bilaterally." *Id.* (citing Ex. 13F). The record certainly supports the ALJ's determination about Whitaker's hand symptoms. *See* PCCW Treatment Notes, Ex. 13F. The medical record and Whitaker's testimony reflected, however, that her feet were also affected by neuropathy. The ALJ stated in his decision that Whitaker "testified that she [found] it difficult to do things with [her] hands because she experiences a frequent sense of numbness," ALJ Decision, R. at 25, but Whitaker also testified that she had neuropathy in her feet for longer than she has had it in her hands, that her "feet go numb" when she is on her feet for more than ten minutes, and that she has to elevate them "five to six times" per day. Tr. of ALJ Hr'g, R. at 48, 50.

The medical record reflects that Whitaker consistently complained about the neuropathy in her feet. In January 2011, medical records reflect that Whitaker sought treatment for her "eight to nine month history of numbness in her legs" and examination "shows she [had]

decreased sensation" to pinpricks extending halfway up her legs. Dr. Siegel Treatment Notes, Ex. 1F, R. at 330. She was seen two months later for a follow up, complaining of "[n]umbness and [b]urning" in her feet, and examinations showed "tingling … [in] both feet." *Id*. at 341. Treatment notes also reflect that Whitaker had "[d]ecreased response to pain and temperature stimulation" and "decreased response to stimulation by vibration on the leg/foot" and on the "toes of both feet." *Id*. at 343. In July 2012, Whitaker underwent a foot exam because she "had concerns over numbness" and after testing, records reflected that she had "numbness, especially [in her] right" foot. Foot Care Group Treatment Notes, Ex. 3F, R. at 355. Whitaker continued to seek treatment and doctors routinely found that she had "[l]imb pain (foot)." Carruth Treatment Notes, Ex. 6F, R. at 497 (January 2013), 498 (February 2013), 499 (March 2013). Further, Dr. Underhill's notes from April 2013 reflect that Whitaker "reported difficulty standing and walking beyond ten minutes" due to her foot neuropathy. Dr. Underhill Treatment Notes, Ex. 7F, R. at 500. Medical records from August 2013, November 2013, March 2014, and June 2014 show that Whitaker suffered from "vibration sense decreased in feet" and she had decreased feeling to a pinprick in both feet. Valley Medical Center Treatment Notes, Ex. 10F, R. at 528, 532, 535, 539. In March 2014, Whitaker reported that the pain in her feet was a nine on a scale of one to ten. Dr. Wang Treatment Notes, Ex. 11F, R. at 586. In May 2014, she reported that she was worried that her foot neuropathy was "affecting her performance" in barber school. Dr. Hamdheydari Treatment Notes, Ex. 9F, R. at 524. Further, in August, September, and October of 2014, treatment notes from the Pain Care Center of Wallingford reflect that she complained of sharp, burning, and frequent pain in her feet at a pain level of eight on a scale of one to ten. PCCW Treatment Notes, Ex. 13F, R. at 612-14, 616-18, 620-22. Each of those treatment notes reflect, however, that Whitaker appeared to be "in no acute distress." *Id*.

The ALJ should have discussed more fully Whitaker's claimed foot limitations when determining her credibility and should have referenced in his decision the treatment notes that reflect her history of foot problems.  In light of the entire record, however, those errors were not so severe so as to warrant a remand.  *Zhong v. U.S. Dept' of Justice*, 480 F.3d 104, 117 (2d Cir. 2006) (where error is harmless, remand is not warranted).  Even in the face of an oversight, the ALJ's decision may be upheld if the error was "harmless," that is, if other "substantial evidence in the record" supports the ALJ's conclusions.  *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014); *Zhang*, 480 F.3d at 117 ("when overwhelming evidence in the record makes it clear that the same decision is inevitable," remand is not warranted); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (stating that harmless error may not necessitate remand to agency).

In his RFC determination, the ALJ limited Whitaker to only occasional stair climbing and only four hours of standing or walking in an 8-hour workday.  ALJ Decision, R. at 23.  Although the ALJ did not specifically analyze Whitaker's claims of foot limitations, his RFC determination is consistent with the limitations reflected in the record.  First, the ALJ discredited Whitaker's subjective complaints on the basis that her daily activities, specifically her successful completion of barber school, were inconsistent with her claimed limitations.  ALJ Decision, R. at 26.  The same analysis applies to Whitaker's claimed foot limitations.  Whitaker alleges that she has trouble standing or walking for more than ten minutes at a time, yet she successfully completed barber school where she spent half of every day participating in "hands on" training.  It is a natural assumption that she would have been standing and/or walking for much, if not all, of that portion of the training, and there is no indication in the record to the contrary.  The record reflects that at one point, Whitaker was concerned that her foot neuropathy was negatively affecting her performance in barber school.  Dr. Hamdheydari Treatment Notes, Ex. 9F, R. at

524. The record is quite clear, however, that Whitaker did successfully complete the program and hoped to get a job in the barber field at some point. Further, Whitaker alleged throughout the record that she could only stand or walk for ten minutes at a time due to her foot limitations. Dr. Underhill Treatment Notes, Ex. 7F, R. at 500; Tr. of ALJ Hr'g, R. at 48, 50. The ALJ's RFC determination is not inconsistent with Whitaker needing to sit down every ten minutes to rest her feet. Accordingly, the ALJ's RFC determination, limiting Whitaker to walking and/or standing for half of a workday, is supported by the medical record and is not inconsistent with Whitaker's recorded abilities.

Secondly, the ALJ further addressed Whitaker's claims of foot neuropathy in his RFC determination with respect to her ability to climb stairs. In a pre-hearing brief submitted to the ALJ, Whitaker's representative stated that Whitaker had numbness in her feet, and, because of that, she "had difficulty climbing stairs." Rep. Brief, R. at 323. Seemingly in response to that claimed limitation, the ALJ limited Whitaker to only occasional stair climbing in his RFC. Accordingly, the RFC determination was consistent with Whitaker's recorded abilities. Further, similarly to her back pain, Whitaker's subjective complaints regarding her foot limitations are undermined by the medical evidence. Although Whitaker regularly complained of numbness and pain in her feet, treatment providers consistently reported that she did not seem to be in acute distress. PCCW Treatment Notes, Ex. 13F, R. at 612-14, 616-18, 620-22. Lastly, although the record is clear that Whitaker did complain about her foot neuropathy to her treatment providers and at the ALJ hearing, the record as a whole seems to suggest that her other claimed limitations were of more concern. Whitaker's complaints about her diabetes, eye issues, and back pain were documented more frequently and discussed in more depth in her treatment records and at the hearing. Those claimed limitations were also thoroughly addressed by the ALJ in his decision.

Although the ALJ should have also discussed more thoroughly Whitaker's foot concerns, that specific limitation was not as present in the record, nor pressed as heavily by Whitaker, as were her other limitations. The ALJ adequately addressed what seemed to be Whitaker's main concerns, and, nonetheless, her claimed foot limitations were still sufficiently accounted for in the ALJ's RFC determination. Accordingly, any error the ALJ made in failing to fully address Whitaker's foot neuropathy was harmless and does not warrant a remand.

## IV.    Conclusion

For the reasons set forth above, I GRANT the Commissioner's Motion to Affirm its Decision (Doc. No. 21), and DENY Whitaker's Motion to Reverse the Decision of the Commissioner (Doc. No. 20). The Clerk shall enter judgment in favor of the Commissioner and close the case.

So ordered.

Dated at Bridgeport, Connecticut, this 25th day of September 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge